**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


**MATHEW ZUBIA,**

$\qquad\qquad$ **Plaintiff,**

**vs.** $\qquad\qquad\qquad\qquad\qquad\qquad$ **09cv1073 JCH/KBM**

**CHRISTOPHER S. ROMERO
and THE BOARD OF COUNTY
COMMISSIONERS OF BERNALILLO
COUNTY**

$\qquad\qquad$ **Defendants.**


**MEMORANDUM OPINION AND ORDER**

$\qquad$ This matter is before the Court on Plaintiff's *Motion for Partial Summary Judgment on Plaintiff's Malicious Prosecution Claim*, filed August 26, 2010 [Doc. 60], and Defendants' *Motion for Summary Judgment*, filed August 27, 2010 [Doc. 63]. The Court, having considered the motions, briefs, exhibits, and relevant law, and being otherwise fully informed, finds that Plaintiff's motion should be DENIED, and that Defendants' motion should be GRANTED in part and DENIED in part as specified below.

**BACKGROUND**

$\qquad$ This case arises from an incident in which Plaintiff was arrested and charged with aggravated driving while impaired ("DWI"). Plaintiff contends that his arrest and the treatment he received while in custody were both improper. Although significant factual disputes exist regarding the some of the details of the incident, the parties are in agreement on the general outline of the following narrative. Where either side contests one of the following facts, such objection will be noted.

On November 3, 2008, at approximately 2:39 a.m., Defendant Deputy Chris Romero ("Romero") was patrolling an area in southwest Albuquerque. He noticed a silver van directly behind a white car, both traveling southbound on Coors Blvd., approaching the intersection near which Romero was parked. The driver of the van was tailgating the car and yelling out the window while gesticulating. Romero was reportedly concerned that an incident of road rage was occurring, so he initiated a stop of the van. The van's driver was Anne Zubia, Plaintiff's wife. While Romero was speaking with Ms. Zubia, Plaintiff turned around and drove up to Romero. Upon contact with Plaintiff, Romero smelled an odor of alcohol coming from Plaintiff, and observed that his eyes were bloodshot and watery. At that point, Romero had Plaintiff pull off to the side of the road.

After Plaintiff pulled to the side of the road, Romero approached his car again. He asked Plaintiff to tell him what was going on between him and his wife. Plaintiff explained that he had been at a friend's house and that he had stayed too long, so his wife got mad and came to get him. At that point, Romero noticed that Plaintiff's speech was slurred, and asked Plaintiff if he normally talked with a slur. Plaintiff replied that he does not usually slur his words. In his Response to Defendants' Motion for Summary Judgment ("Resp. to Deft. MSJ") [Doc. 75], Plaintiff denies that Romero inquired about slurred speech and also denies that his speech was slurred. *See* Doc. 75 at 2, ¶ 11-12. In support of his denial, Plaintiff cites an audio recording of Romero's belt tape, which is attached as Ex. M to Doc. 75 ("Belt Tape"). However, not only does the recording of the belt tape contain Romero's question about slurring and Plaintiff's response that he does not usually slur when he speaks, *See* Belt Tape at 2:10-2:15, it also demonstrates that Romero said "obviously, the reason I'm asking is because you're slurring," to which Plaintiff replied "I know." *See id.* at 2:46-2:50.

2

Romero asked Plaintiff how much he had to drink that night. Plaintiff admitted that he had consumed "probably about four beers," with the last one being approximately and hour and a half prior to being stopped. *See id*. at 2:16-2:25. Plaintiff denies that he told Romero this, and contends that he told Romero that he had consumed three beers four hours prior to being stopped. *See* Doc. 75 at 2, ¶ 10. In support of this contention, Plaintiff cites his own deposition testimony regarding what he told Romero. *See* Ex. K, attached to Doc. 75, at 128:25-129:10. Plaintiff's recollection of what he told Romero is unequivocally demonstrated to be contradicted by the belt tape audio Plaintiff attaches to his response, and it cannot serve as a proper denial for purposes of summary judgment. Romero informed Plaintiff that he smelled like alcohol, to which Plaintiff replied "I know," and offered the explanation that his wife had spilled beer on him. Belt Tape at 2:50-2:55.

Romero then asked Plaintiff if he would consent to taking field sobriety tests, and Plaintiff agreed to perform such tests. Plaintiff preemptively told Romero that he was not sure how well he would do on the tests because he was disabled and had a bad leg and herniated disks. Romero noted that Plaintiff had walked the approximately 30 feet from his car to the test site with no discernable limp. Plaintiff indicated that he might have trouble on the tests because one of his legs was shorter than the other. Romero attempted to take Plaintiff's injuries into account when administering the tests. For example, when administering a test in which the subject stands on one leg while lifting his other foot six inches off of the ground, Romero advised Plaintiff that he might want to stand on his left leg and raise his right foot, because Plaintiff had indicated earlier that his right knee was injured. *See id*. at 11:35-11:45.

Two of the tests that Romero administered required the use of balance (walk-and-turn and one-leg stand), and two did not (horizontal gaze nystagmus and finger dexterity). Plaintiff did not

complain of pain while performing the field sobriety tests, nor did he complain of any pain upon conclusion of the tests.  Plaintiff admits that the field sobriety tests conducted by Romero were appropriate.  *See* Pl. Resp. to Deft. MSJ [Doc. 75] at 3, ¶ 17.  Romero concluded that the result of the tests indicated that Plaintiff was impaired to some degree.  Romero then placed Plaintiff under arrest, handcuffed him, and read him the New Mexico Implied Consent Advisory.  The Implied Consent Advisory notifies drivers under arrest for DWI that they must provide a breath and/or blood sample to determine drug or alcohol level, and that refusal to consent can result in a charge of aggravated DWI.  *See* NMSA 1978 § 66-8-111.  Plaintiff said that he understood, and he agreed to provide a breath sample.

Romero then walked Plaintiff to his patrol car without incident.  Plaintiff contends that, when they reached the patrol car, he took a long time to get in because of his size, and Romero ultimately shoved him in, causing him to experience back spasms.  The parties differ as to whether Plaintiff complained of any pain at this point.  Romero contends that Plaintiff did not complain of any injury at that point, and that he was transported to the police substation "without incident."  Defendants' MSJ [Doc. 64] at 5, ¶ 23.  Plaintiff contends that, because he was shoved into the patrol car, he lay across the backseat of the car without a seatbelt, and that he remained in that position throughout his transport to the substation.  *See* Pl. Resp. to Deft. MSJ at 3, ¶ 23.  Plaintiff also contends that he informed Romero during the ride that his back hurt.  *See id*.

Upon arriving at the substation, Romero and Plaintiff walked without incident from the parking lot to the room containing a breathalyzer machine.  Once in the room, Plaintiff sat down on a chair.  At this point, he remained handcuffed with his hands behind his back.  When Romero informed Plaintiff that he would be taking a breath test and started to calibrate the machine, Plaintiff fell off of his chair and began shouting that his back hurt.  At that point, Romero

immediately secured Plaintiff in a "face down stabilization position, with his knee across [Plaintiff's] back." Deft. MSJ at 6, ¶ 28. Plaintiff characterizes Romero's actions as "jumping onto his back after he fell to the floor." Pl. Resp. to Deft. MSJ at 4, ¶ 28. Plaintiff testified at his deposition that Romero may have thought Plaintiff was trying to run away when he fell off of the chair. *See* Zubia Depo., attached as Ex. C to Doc. 64, at 158:15-23. While on the floor, Plaintiff complained vociferously of back pain and stated that he could not get up to take the breath test.

Romero then contacted dispatch to summon medical personnel. Personnel from the Bernalillo County Fire Department ("BCFD"), EMT Alexandro Coriz and Paramedic Brian Sherman, responded. What occurred next is the subject of substantial disagreement between the parties. According to the testimony of both emergency responders, Plaintiff was belligerent and abusive toward them, yelling obscenities and refusing either a hands-on examination or any other treatment. Paramedic Sherman testified that, based on Plaintiff's slurred speech, he appeared to be inebriated, but that he also appeared to be coherent and in no immediate medical danger. Therefore, based on his assessment and on Plaintiff's refusal to be treated, he and his partner left. Plaintiff contends that he never acted inappropriately toward the BCFD personnel, and that Romero unilaterally sent them away without allowing them to examine or treat him.

Both before and after emergency personnel came, Romero told Plaintiff that if Plaintiff was unable to perform the breathalyzer test, he would have to take a sample of Plaintiff's blood to do a chemical test. Plaintiff repeatedly told Romero that Romero did not have the right to take his blood and that he refused to allow a blood draw. Romero told Plaintiff that if he did not get up to take a breath test or did not consent to a blood draw, he would be charged with aggravated DWI. Romero then moved Plaintiff's handcuffs from behind his back to the front, in an effort to make it easier for him to stand up, however, Plaintiff did not stand up at that point, claiming that

5

he could not stand up or walk.  Plaintiff repeatedly refused to give a breath test until he received

medical assistance.  *See* Transcript of Belt Tape, attached as Ex. C to Pl. MSJ [Doc. 60] at 14:19-

17:15.  Romero took this as a refusal to submit to chemical testing, and it is on this basis that he

charged Plaintiff with aggravated DWI.  *See* Romero Depo, attached as Ex. B to Pl. MSJ, at 94:4-

95:5.

        Following Plaintiff's refusals to provide a blood sample or a breath sample without

receiving medical assistance, Romero concluded that his options were to have Plaintiff

transported to the hospital or to jail.  Because medical personnel had not advised Romero that

Plaintiff required hospitalization, Romero decided to transport Plaintiff to jail.  Romero

moved his patrol unit next to the door of the substation, so that the walk would not be more than

approximately 20 feet from the breathalyzer room.  He got the assistance of another deputy, and

the two of them each took one of Plaintiff's shoulders.  Plaintiff claims that Romero and another

deputy stood on the backs of his legs and attempted to pull him to a standing position, thereby

injuring his knees.  Romero states that he and the deputy assisted Plaintiff to the vehicle.  Plaintiff

contends he was flipped onto his stomach and dragged by his hands and handcuffs throughout the

station and over the pavement, suffering abrasions and torn clothes.  Romero states that the

deputies were unable to get Plaintiff in the car, so they placed him in a sitting position and again

called emergency personnel to the scene.  Plaintiff claims that the officers slammed him into the

side panel of the patrol car and told him to crawl inside, which he was unable to do.

        The same BCFD emergency personnel again arrived at the scene, along with an

ambulance.  According to the testimony of both emergency personnel, Plaintiff was again

uncooperative and refused treatment.  EMT Coriz testified that, when he told Plaintiff that they

would leave if he did not stop his uncooperative and non-complaint behavior, Plaintiff calmed

6

down and allowed them to examine him.  Plaintiff contends that he was only yelling for help because Romero and other deputies were taunting him, that he was never uncooperative, and that he did not refuse treatment.  Plaintiff admits that BCFD emergency personnel did not observe or note any torn clothing, abrasions, bruising, or other signs of trauma to his person.  Plaintiff was then taken to University of New Mexico Hospital, where he stayed for several days, complaining of paralysis and weakness in both legs.

Romero did not accompany Plaintiff to the hospital in an attempt to obtain a blood test. Instead, he later issued a summons charging him with aggravated DWI for his refusal to submit to chemical testing.  At the ensuing criminal bench trial in state court, a judge granted Plaintiff's motion for directed verdict with respect to the aggravated portion of the DWI charge, and acquitted him of the underlying DWI charge as well.  The judge indicated that she believed Plaintiff was being manipulative with respect to his back injury and his claim that he could not complete the breathalyzer test, that she didn't like entering the verdict, and that she believed that Plaintiff was driving under the influence, but that she was not convinced beyond a reasonable doubt.  She also commended Romero for his patience and restraint in the face of someone "rambling on and on and trying everything to get out of the test," and she indicated that her verdict should not be seen as a reflection on Romero.  *See* Trial Transcript, attached as Ex. A to Pl. MSJ [Doc. 60] at 103.

Following his acquittal in the criminal trial, Plaintiff brought this suit.  Plaintiff's suit has four counts: (1) an action under 42 U.S.C. § 1983 for unlawful arrest, which asserts that Romero had no probable cause to arrest him for DWI; (2) an action under 42 U.S.C. § 1983 for excessive force based on shoving him in the car, attempting to force him to stand, and dragging him on the pavement; (3) an action under 42 U.S.C. § 1983 for malicious prosecution based on the

7

aggravated DWI charge of which he was acquitted; and (4) state law tort claims for assault, battery, false imprisonment, wrongful arrest, malicious prosecution, abuse of process, unreasonable search and seizure, and excessive force.

On March 1, 2011, the Court held a *Daubert* hearing concerning several proposed expert witnesses in this case.  The Court ruled that Plaintiff's experts Dr. Samuel Tabet and Dr. Keith Harvie and Defendant's expert Dr. Gary Vilke could all testify subject to certain limitations imposed in the Court's Order [Doc. 98].  The Court also ruled that Plaintiff's proposed DWI expert, Tony Corroto, could not testify because his opinion was the product of unreliable methodology and was not likely to assist the jury in determining the facts at issue.

## <u>LEGAL STANDARD</u>

Summary Judgment is appropriate if "the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247 (1986); *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997); Fed. R. Civ. P. 56(c).  The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 484 (10th Cir. 1995).  The moving party has the initial burden of showing that there is no genuine issue of material fact.  *Anderson*, 477 U.S. at 256.  Once the moving party has met its burden, the non-moving party must do more than merely show that there is some doubt as to the material facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rest on mere allegations or denials of the pleadings, but must set forth specific facts showing a genuine issue for trial.  *Anderson*, 477 U.S. at 248, 256.  Although the Court views the evidence and draws all inferences in the light most favorable to the party opposing summary judgment, that party still "must identify sufficient

8

evidence which would require submission of the case to a jury." *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992). Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Anderson*, 477 U.S. at 248.

Special standards apply to the assessment of a summary judgment motion raising the defense of qualified immunity, as Defendants' motion does with respect to the Section 1983 claims. *Hinton v. City of Elwood*, 997 F. 2d 774, 779 (10th Cir. 1993). Qualified immunity protects governmental officials preforming discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant asserts a qualified immunity defense, the plaintiff bears the initial burden of making two showings: that a plaintiff's allegations, if true, establish a constitutional or statutory violation, and that "the law was clearly established at the time the alleged violations occurred."[1] *Gomes*, 451 F.3d at 1134. If the allegations, taken in the light most favorable to the plaintiff, do not establish the violation of a constitutional or statutory right, or the Court determines that the law was not clearly established at the time of the alleged violation, the Court must dismiss the claim. *Id*.

The law is considered clearly established if a reasonable official in the defendant's circumstances would understand that his conduct violated the plaintiff's constitutional or statutory rights. *Id*. For the law to be clearly established, thereby rendering a qualified immunity claim inapplicable, the law must have been developed in such a concrete and factually defined context to make it obvious to all reasonable governmental actors in the defendant's place that

---

[1] The Court may take up the questions of constitutional violation and clearly established law in either order. *See Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

what the defendant is doing violates federal law. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In order for a plaintiff to show "that a law is clearly established, 'there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998). This is not to say that, for the law to be clearly established, prior cases must have involved precisely the same factual situation as the case at hand. Rather, "government officials must make 'reasonable applications of the prevailing law to their own circumstances,' and they 'can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Gomes*, 451 F.3d at 1134 (internal citations omitted).

If a plaintiff makes both required showings, the burden then shifts back to the defendant to make the usual showing required of defendants moving for summary judgment, namely that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *See Hinton*, 997 F.2d at 779.

## ANALYSIS

1.      Wrongful Arrest Claim

Plaintiff claims that Romero violated his constitutional rights by arresting him for DWI without probable cause. If an arrest that is made without a warrant is the subject of a Section 1983 action, an officer is entitled to qualified immunity if probable cause existed to arrest the plaintiff. *See Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007). An officer may arrest a person without a warrant if he has probable cause to believe that the individual has committed even a very minor criminal offense in his presence. *See id.* (citing *Atwater v. Lago Vista*, 532 U.S. 318, 322 (2001)). Whether or not probable cause to arrest exists depends on a determination of whether the facts and circumstances within a defendant officer's knowledge would be

sufficient to justify a prudent officer's belief that the arrestee has committed or is committing an offense. *See United States v. Stephenson*, 452 F.3d 1173, 1178 (10th Cir. 2006). A finding of probable cause does not require certainty of guilt or even a preponderance of evidence of guilt. *United States v. Patane*, 304 F.3d 1013, 1018 (10th Cir. 2002). Instead, it requires only "a probability of criminal activity, not a *prima facie* showing of such activity." *Wilder*, 490 F.3d at 813. Probable cause is determined by looking at the totality of the circumstances, taking into account both inculpatory and exculpatory evidence. *Stephenson*, 452 F.3d at 1178. Significantly for this case, because probable cause is determined by reference to the circumstances confronting an officer at the time of the warrantless arrest; subsequent events such as dismissal of charges or an acquittal do not undermine the validity of an arrest supported by probable cause. *Wilder*, 490 F.3d at 814 (citing *Summers v. Utah*, 927 F.2d 1165, 1166 (10th Cir. 1991)).

Based on the facts and circumstances within Deputy Romero's knowledge at the time, he had probable cause to arrest Plaintiff on suspicion of DWI as a matter of law. Plaintiff admits that he had an odor of alcohol about him when Romero talked to him. Romero's belt tape clearly confirms that Plaintiff admitted to drinking "probably about four beers" an hour and a half prior to being stopped (not three beers four hours earlier, as Plaintiff attempts to claim in his Response to Defendants' Motion for Summary Judgment). *See* Ex. M to Doc. 75 ("Belt Tape") at 2:16-2:25. Plaintiff does not deny that Romero observed his eyes to be bloodshot. Although Plaintiff now denies Romero's contention that he was slurring his words, when Romero indicated to Plaintiff at the time of the stop that he was slurring, Plaintiff acknowledged it. *See* Belt Tape at 2:46-2:50.[2]

_____

[2] Plaintiff relies on the audio of the belt tape as his evidence that he was not slurring. *See* Doc. 75 at 2, ¶ 11; *id*. at 14. Having listened carefully to the tape, even taking the evidence in

These indicia of alcohol consumption gave Romero reasonable suspicion to conduct field sobriety tests ("FSTs"). *See Vondrak v. City of Las Cruces,* 535 F.3d 1198, 1207 (10th Cir. 2008) (driver's statement that he had one beer three or four hours ago, by itself, provided officer with reasonable suspicion to perform FSTs or, at the very least, arguable reasonable suspicion entitling officer to qualified immunity). Romero administered four FSTs, taking into account Plaintiff's claims of leg and back injuries and his obesity. Romero concluded that the results of all four tests indicated impairment. Neither Plaintiff's leg and back injuries nor his weight impeded his ability to perform the eye gaze or counting test. Based on the results of these tests and the other indicia of alcohol use and impairment, Romero arrested Plaintiff.

Plaintiff does not contend that he passed the FSTs, but rather claims that they were "inconclusive" because of his knee and back injuries and weight. *See* Doc. 75 at 2-3, ¶¶ 15, 24; *id*. at 14. To support this claim, Plaintiff cites the report of his proposed DWI expert, Tony Corroto. On March 1, 2011, the Court held a hearing on Defendants' *Daubert* Motion with Regard to Tony Corroto [Doc. 62]. The Court concluded that Mr. Corroto's opinions were not sufficiently reliable and were not likely to assist the trier of fact, and it therefore ruled that Mr. Corroto's report and testimony were inadmissible. *See* Doc. 98. However, even if Mr. Corroto's report were admissible, it would not have assisted Plaintiff with respect to his wrongful arrest claim. Although Mr. Corroto points to certain weaknesses of some of the FSTs, particularly with respect to a subject like Plaintiff who was significantly overweight and who complained of back and knee injuries, he testified in his deposition that the decision as to whether to conduct FSTs on individuals more than 50 pounds overweight is case-specific and "based necessarily on the

---

the light most favorable to Plaintiff, the Court cannot say that Romero was not justified in observing that Plaintiff was slurring.

judgment of the officer at the scene," rather then being improper under all circumstances.  *See*
Corroto Depo., attached as Ex. B. to Deft. *Daubert* Mot. [Doc. 62] at 43:17-44:9.  In addition, Mr.
Corroto testified that the standard FSTs that Romero performed are the tests that an officer should
administer, and that he had no quarrel with the manner in which Romero conducted any of the
tests.  *See id.* at 50:4-7, 52:15-19.

Corroto's report also attempts to cast doubt on the reliability of standardized FSTs as an
indicator of impairment, even though he testified that those were the proper tests to administer.
However, even if failure of all four FSTs does not conclusively prove impairment, this does not
mean that failure does not provide probable cause to suspect impairment.  Chemical tests are then
conducted after arrest in order conclusively assess a level of impairment.  Mr. Corroto never
contends that arrest based on failure of FSTs, combined with other indicia of drinking or
impairment, is unusual or improper.

In addition, while failing FSTs does not necessarily indicate that a driver has a blood
alcohol concentration ("BAC") of .08, the minimum level at which intoxication is legally
presumed, New Mexico law proscribes driving while influenced even to the slightest degree.  *See*
NMSA 1978 § 66-8-102(a); *State v. Neal*, 143 N.M. 341, 349 (Ct. App. 2007) ("The statute gives
notice, according to the plain meaning of the word 'influence,' that the Legislature intends to
criminalize a condition less than intoxication, but 'influenced' to any degree by alcohol, no matter
how slight.").  Mr. Corroto's report did not opine that failure of four FSTs, combined with the
other circumstances of this case, was not a reasonable basis on which to determine that Plaintiff
likely exhibited that he was influenced by alcohol, even to the slightest degree.  This is consistent
with Defendants' expert report, prepared by David D. Kopenhaver and unchallenged by Plaintiff,
which concludes that Romero's actions, including the arrest, were "consistent with all generally

accepted practices, training, policy, and legal mandates as recognized in law enforcement throughout the United States." *See* Kopenhaver Report, attached as Ex. G to Deft. MSJ [Doc. 64] at 5, ¶ 14.

Plaintiff contends that this case is similar to *Cottrell v. Kaysville City*, 994 F.2d 730 (10th Cir. 1993), in which the court found that a question of fact existed regarding whether an officer had probable cause to arrest for DWI.  However, *Cottrell* is inapposite because the plaintiff in that case denied drinking or taking any drugs, the arresting officer did not detect any alcohol on her breath, and there was a factual dispute as to whether she had failed FSTs.  *See Cottrell*, 994 F.2d at 732.  Plaintiff also tries to distinguish his situation from cases such as *Wilder*, 490 F.3d at 815, and *Summers*, 927 F.2d at 1166, which held that probable cause to arrest existed where officers smelled alcohol and drivers refused to take FSTs.  While Plaintiff agreed to take the FSTs in this case, he failed them.  Having failed the tests, he cannot plausibly claim to be in a more advantageous situation that those in other cases who refused to take the tests.  Probable cause for a warrantless arrest is determined by the totality of the circumstances confronting the arresting officer.  Given the undisputed facts,  Romero had probable cause to believe that Plaintiff was driving under the influence, to at least a slight degree, and the arrest was proper as a matter of law.

> 2.   Failure to Provide Medical Assistance

Plaintiff contends that he has a separate claim for an "illegal seizure" arising from Romero's alleged failure to provide him with medical assistance.  Although Plaintiff included allegations related to a failure to provide medical assistance in his Complaint, *See* Ex. A to Doc. 1 at 6, ¶¶ 44-46, he did not include a claim related to such failure in his enumerated counts, including the count related to his alleged unlawful arrest.  *See* Count 1 of Complaint, contained in

¶¶ 81-84.  It is only in his Response to Defendants' Motion for Summary Judgment that Plaintiff, for the first time, characterizes the alleged failure to provide him with medical assistance as a claim for "illegal seizure."  In his Response, Plaintiff claims that "[c]ertainly when an officer prevents medical help from attending to a person in his custody, when that person is incapable of walking due to injury, he has affected an illegal seizure."  Pl. Resp. to Deft. MSJ at 17.  Plaintiff provides no case law holding that failure to provide adequate medical care to someone otherwise properly in custody constitutes an illegal seizure, and the Court has not located any such cases.[3]  Plaintiff cites *Meyer v. Bd. of County Comm'rs of Harper County*, 482 F.3d 1232, 1242 (10th Cir. 2007), for the proposition that "conduct [may be] so bad that case law is not needed to establish that this conduct cannot be lawful."  *See* Pl. Resp. to Deft MSJ at 17.  However, in order to properly state a claim, a plaintiff must do more than simply identify behavior that is "unlawful"; he must identify a specific provision of the law that has been violated.  This is essential in order to provide the proper framework under which to analyze a claim.  Analyzing a claim for failure to provide medical care under typical Fourth Amendment illegal seizure jurisprudence, which tends to focus on reasonable suspicion and probable cause to detain, makes little sense.

However, under the Fourteenth Amendment's due process clause, a pre-trial detainee, such as Plaintiff, is afforded the same degree of protection regarding medical attention as convicted inmates are entitled to under the Eighth Amendment.  *See Barrie v. Grand County*, 119 F.3d 862, 867 (10th Cir. 1997); *Howard v. Dickerson*, 34 F.3d 978, 980 (10th Cir. 1994).  The

---

[3] Plaintiff suggests, alternatively, that his claim related to medical care could be characterized as one for excessive force instead.  He likewise cited no case law supporting his contention that this could fall within the parameters of an excessive force claim, and the Court found no cases indicating that this type of claim should be analyzed under an excessive force framework.

Court will therefore analyze his claim under this standard.  Under the Fourteenth Amendment, a claim for failure to provide adequate medical attention must be analyzed under the "deliberate indifference to serious medical needs" standard, as announced in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  *See Barrie*, 119 F.3d at 868.  For a pre-trial detainee to state a claim against his custodian for failure to provide adequate medical attention, he must show that the custodian knew of the risk involved to the claimant and that he was deliberately indifferent to that risk.  *Id*. at 868-69.  *Estelle* holds that deliberate indifference can be demonstrated by showing that someone in charge of a detainee intentionally denied or delayed access to medical care.  *See* 429 U.S. at 104.  Plaintiff has failed to come forward with evidence demonstrating that Romero intentionally denied him medical care, and his claim therefore fails.

Plaintiff's Complaint alleges that, after Romero summoned emergency personnel to investigate Plaintiff's claims that his back was injured, "Romero then told the firefighters and paramedics that [Plaintiff] did not need medical assistance and had them leave."  Complaint at 6, ¶ 44.  At that point, Plaintiff alleges, "[t]he firefighters and paramedics then left the scene per Defendant Romero's direction, without ever having contact with Mr. Zubia at that point."  *Id*. at ¶ 46.  At the summary judgment stage, the nonmoving party may not rest on mere allegations, but must set forth specific facts showing a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Plaintiff has not come forward with such facts to create an issue for trial regarding whether Romero intentionally denied Plaintiff access to medical care.

In his Response to Defendants' Motion for Summary Judgment, Plaintiff cites four pieces of evidence to support his assertion that Romero prevented emergency personnel from evaluating Plaintiff after he called on them to come to Plaintiff's aid.  *See* Doc. 75 at 17.  The first item to which Plaintiff refers is the report submitted by Alexandro Coriz, one of the two emergency

16

personnel who responded to Romero's call.  The report included the notation "cancelled on scene by BCSO [Bernalillo County Sheriff's Office], no PT [patient] contact."  *See* Ex. D, attached to Doc. 75.  In his deposition, Mr. Coriz explained that the notation "cancelled by BCSO" simply indicates that, if a patient is uncooperative and the emergency personnel receive permission from the Sheriff's Office to leave, they are noting that they are leaving the patient in the custody of the sheriff's department.  *See* Coriz Depo., attached as Ex. I to Doc. 64, at 25:2-8.  Plaintiff has come forward with no evidence to contradict Mr. Coriz's explanation that the notation indicates that they were free to leave, rather than that they were prevented from seeing Plaintiff.

Plaintiff also points to the recording of Romero's belt tape, but the cited portion of the tape likewise provides no evidence that Romero prevented the emergency personnel from responding to Plaintiff.  *See* Transcript of Belt Tape, attached as Ex. C. to Doc. 75, at 12:17-13:18.  The cited portion of the belt tape contains an argument between Plaintiff and Romero in which Plaintiff accuses Romero of having sent away medical care.  Romero insists that he did not send anyone away, and that the emergency personnel had inspected Plaintiff.  Plaintiff denies that medical personnel looked at him.  The argument goes back and forth in this fashion several times.  Romero then says he didn't send the emergency personnel away; that they left on their own.  Plaintiff does not dispute this, but instead replies "well, they did not check me and I wish to have some response now...they looked at me from right where you are standing.  I wish to request medical assistance right now."  *Id*. at 13:12-18.  Nothing in this encounter indicates that Romero was responsible for intentionally preventing responding medical personnel from treating Plaintiff.

Plaintiff also cites his own deposition testimony in support of his claim, but this testimony likewise fails to provide evidence to create a triable issue of fact.  He does not provide any testimony that Romero ordered the responding medical personnel to leave without allowing them

17

to treat him.  The closest he appears to come to asserting this is when he testified "[w]ell, [Romero] had told me, 'You are going to get a blood test' and that [the medical personnel] were on their way.  And then I don't know what he told them but all of a sudden they started to walk away."  Zubia Depo., attached as Ex. K to Doc. 75, at 174:11-15.  Despite contending that Romero was in the room with him the whole time medical personnel were there, Plaintiff does not offer evidence of anything that Romero said to order them to leave without treating Plaintiff.  In fact, Plaintiff contends that the medical personnel were in the room with him, "two inches from his face" and that they were there "for no longer than five minutes."  *Id*. at 178:13-15, 179:13. Plaintiff contends that the paramedics never talked to him during the whole time they were standing two inches from him.  Clearly, by Plaintiff's own admission, Romero did not prevent the medical personnel that he summoned from approaching Plaintiff.  Nor does he provide any evidence that Romero prevented them from examining Plaintiff, or that he ordered them to leave. Without this evidence, there is no ability to show deliberate indifference or deliberate denial of medical care.

Finally, Plaintiff points to the deposition testimony of Christa Aragon, an employee of Albuquerque Ambulance who responded the second time emergency personnel were dispatched to assist Plaintiff.  When she was asked if Plaintiff made any complaints of mistreatment by the deputies, she said she could not recall specifically, "but there was something about how he needed medical care, and they weren't giving it to him."  *See* Aragon Depo., attached as Ex. P to Doc. 75, at 24:10-17.  She later said that, on the way to the hospital, "he said that they were not going to give him medical treatment, and that's when he was going to [sue].  That's what he kept reiterating to me."  *Id*. at 26:20-23.  This is consistent with Plaintiff's claim that he feels that he did not receive adequate medical attention when the emergency personnel responded the first

18

time, but it does nothing to advance his claim that Romero deliberately prevented personnel from examining him.  Plaintiff's claim of failure to provide medical assistance as stated against Defendant Romero fails for lack of evidence.

       3.    <u>Malicious Prosecution</u>

Plaintiff alleges that Romero violated his rights under the Fourth and Fourteenth Amendment by engaging in malicious prosecution in two different respects: by charging him with simple DWI and by charging him with aggravated DWI.  Plaintiff filed a Motion for Partial Summary Judgment [Doc. 60] with respect to only the charge of aggravated DWI.  Defendants have moved for summary judgment on both malicious prosecution claims.

To prevail on a malicious prosecution claim brought pursuant to 42 U.S.C. § 1983, a plaintiff must demonstrate the following: (1) the defendant caused the plaintiff's prosecution; (2) the prosecution terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.  *See Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).  The absence of probable cause to arrest is an essential element of a Section 1983 malicious prosecution claim.  *See id.*; *Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004).  Because the Court has already found that Romero had probable cause to arrest Plaintiff for simple DWI, it must necessarily dismiss Plaintiff's malicious prosecution claim on that charge.

Plaintiff's malicious prosecution claim on the aggravated DWI charge requires more analysis.  Plaintiff unquestionably meets the first two requirements; that Defendant Romero caused his prosecution and that the prosecution ended in his favor.  However, Plaintiff has failed to demonstrate a lack of probable cause or malice on the part of Romero.

Under New Mexico law, a person is guilty of aggravated DWI if he meets at least one of

the following three elements, in addition to meeting the elements of simple DWI: (1) having a breath or blood alcohol concentration of at least .16; (2) causing bodily injury as the result of DWI; or (3) refusing to submit to chemical testing.  NMSA 1978 § 66-8-102(D).  Romero testified that he based his charge of aggravated DWI solely on his conclusion that Plaintiff was refusing to submit to chemical testing.  *See* Romero Depo. at 94:8-95:5.

Based on the evidence in this case, Plaintiff refused to provide a breath or blood sample, and he is entitled to summary judgment.  In his motion for summary judgment on the malicious prosecution issue, Plaintiff asserts that "[t]here is no question that [Plaintiff] consented to give a breath test, and never stated that he would not give a breath test."  Pl. MSJ [Doc. 60] at 17.  While Plaintiff initially agreed to perform a breath test, prior to the actual administration of the test he fell to the floor and claimed to be unable to provide the sample.  Simply agreeing to provide a sample is meaningless if the subject does not actually follow through and provide a sufficient sample.  *See State v. Vaughn*, 137 N.M. 674, 686 (Ct. App. 2005) ("The plain language of the [Implied Consent Act] indicate[s] legislative intent to motivate suspects to take the test and to punish those who do not take the breath test correctly" so that those who fail to provide the requisite number of samples "have refused to take the test as designed").  In addition, not only did Plaintiff fail to complete the breath test because of his alleged injury, he did, in fact, explicitly refuse to take the breath test on at least one occasion.  *See* Transcript of Belt Tape at 14:20-25. (Romero: "I'm going to give you one more chance to give me a breath score on the breathalyzer." Zubia: "I refuse to do it."  Romero: "You refuse to?"  Zubia: "Without medical assistance, I refuse to.").

Because Plaintiff claimed to be unable to perform a breath test, Romero offered him the option of taking a blood test.  Initially, Plaintiff adamantly refused.  *See id.* at 8:16-11:15.

(Plaintiff repeatedly declaring "No you will not [take my blood.]").  When Romero attempted to explain the consequences of refusal, namely that he would be charged with aggravated DWI, Plaintiff indicated that he would eventually take a test, but that he was not going to do it at that time.  *See* Belt Tape at 17:39-17:42.  After that, Plaintiff continued to refuse to allow Romero to take a blood sample.  *See* Pl. MSJ at 3-4, ¶¶ 13-16.  Plaintiff appears to contend that his statement that "You will not take my blood.  I did not give you that right and as soon as I do have the strength officer...I will get up," and his refusal to give a breath test without medical assistance constitute an "immediate" recision of his initial refusal.  *See id*. at 17.

The New Mexico Supreme Court outlined the limited circumstances under which a motorist could validly rescind an initial refusal to take a blood alcohol test in *State v. Suazo*, 117 N.M. 785 (1994).  A motorist is permitted to rescind his initial refusal when: (1) he does so "before the elapse of the reasonable length of time it would take to understand the consequences of his refusal"; (2) the test would still be accurate; (3) the testing equipment of facilities are still easily available; (4) honoring the request for the test "will result in no substantial inconvenience or expense to the police"; and (5) the motorist requesting the test has been in police custody and under observation since his arrest.[4]  *Suazo*, 117 N.M. at 793.  Plaintiff initially refused to give a blood sample at approximately the same time that the paramedics were initially called, which was 3:24 a.m.  This was approximately 45 minutes after Romero had initiated contact with Plaintiff. Plaintiff repeatedly continued to refuse a blood test, and then finally conditioned his willingness

---

[4] The situation in *Suazo* refers to one in which a motorist who initially refused to take a test soon thereafter explicitly requests that the officer provide the ability to take a test.  *See* 117 N.M. at 791 (reciting the test laid out in *Lund v. Hjelle*, 224 N.W.2d 552, 557 (N.D. 1974) that was adopted in large part by the *Suazo* court).  In this case, Plaintiff never asked to take the test, he only conditionally agreed to take the test that Romero sought to have him take, so it is not clear that *Sauzo* would apply to aid Plaintiff, even if he met the parameters of *Suazo*'s test.

to provide a test upon receiving medical attention.  Plaintiff did not ultimately arrive at the hospital until 5:44 a.m., over two hours after his initial refusal, and over three hours after his initial encounter with Romero.  While Plaintiff contends that he was not in control of when he was taken to the hospital, he was in control of the condition he placed upon Romero's request to draw his blood.[5]

Plaintiff's conditional agreement to give a test that still had not come to fruition after more than two hours did not constitute a valid recision of his initial refusal "before the elapse of the reasonable length of time it would take to understand the consequences of his refusal." *Suazo*, 117 N.M. at 193.  Quite simply, under New Mexico law, "[a] conditional consent is a refusal to take the test." *Fugere v. State of New Mexico Tax & Revenue Dep't*, 120 N.M. 29, 34 (Ct. App. 1995) (citing *Goerig v. State*, 822 P.2d 545, 548 (Idaho Ct. App. 1991) (consent to take breath test on condition that handcuffs be removed is refusal), *Gibbs v. Bechtold*, 376 S.E.2d 110, 112 (W. Va. 1988) (where conduct or words manifest reluctance or qualify assent to take breath test for reasons unrelated to the procedure of the test, refusal is sufficiently established), and *Croissant v. Commonwealth*, 539 A.2d 492, 495 (Pa. Commw. Ct. 1988) (anything less than unqualified assent to take a breath test constitutes a refusal)).

Plaintiff contends that Romero should have accompanied him to the hospital in order to take a blood test, and that failure to do so meant that he did not allow Plaintiff to follow through on his assent to provide a sample after he received medical attention.  Plaintiff cites *State v. Ybarra*, 2010-NMCA-063, for the proposition that an officer's decision to discontinue chemical

---

[5] While Plaintiff contends that he received what he deemed to be inadequate medical attention the first time the paramedics were called out, this issue is immaterial to the issue of malicious prosecution because Plaintiff's conditional consent to submit to a test still constitutes a refusal.

testing based upon his subjective determination that the subject is incapable of completing the test is not appropriate.  *See* Pl. Resp. to Deft. MSJ [Doc. 75] at 18.  *Ybarra* is inapposite because it did not concern refusal to take a test, but rather whether only concerned whether one breath sample was sufficient evidence of intoxication.  The motorist in *Ybarra* unequivocally consented to be tested, but the officer concluded that he was unable to give a second sample because of the severity of his asthma.  The court found that it was the subject's willingness to participate in the test, rather than his physical ability to complete the test that was relevant, so that if the completion of a breath test is impeded by a willing subject who cannot blow, the officer is allowed to direct a blood test.  The officer did not direct a blood test, and unilaterally cancelled testing after only one sample. *Ybarra*, 2010 NMCA 63 at *13.  Thus, *Ybarra* is not helpful to Plaintiff.

In addition, the second prong of the *Suazo* test requires that, for the recision of a refusal to be valid, it must be done when the test would still be accurate.  Under *Suazo,* the burden is on the driver to demonstrate that each element of the test is met.  *See* 117 N.M. at 793.  New Mexico law indicates that a driver is presumed to be intoxicated if he has an alcohol concentration of .08 or more within 3 hours of driving. NMSA § 66-8-102(C)(1).  Plaintiff did not arrive at the hospital until more than three hours after he last drove, and there is no indication of how long, once he arrived at the hospital, it would have taken to receive medical attention that he would deem sufficient to finally grant his willingness to take a blood test.  Plaintiff has not met his burden to demonstrate that, by that time, the test would still be accurate.  Plaintiff variously told Romero that he would take a blood or breath test "later", "not right now," "when I can stand up," and "when I get medical assistance for the pain."  If these types of conditional refusals were allowed, they would reward attempts to run out the clock, such that, when all conditions are

23

finally met, it is too late to get an accurate reading.  Romero was legally justified in concluding that this is what Plaintiff was attempting to do, and in charging him with aggravated DWI.

The fourth prong of the *Suazo* test requires a motorist to demonstrate that a request for a test, following an initial refusal, "will result in no substantial inconvenience or expense to the police."  117 N.M. 793.  Plaintiff offers no evidence of his own to meet his burden, but instead merely asserts that "there is no evidence that accompanying Plaintiff to the hospital would cause Defendant Romero inconvenience."  Pl. Reply to Pl. MSJ [Doc. 83] at 8.  Defendant is not required to establish this cost and inconvenience and, as the *Suazo* court held in finding that the motorist in that case failed the test for rescinding his refusal, "the trip to [the] hospital was arguably an unwarranted expense and inconvenient to the police."  117 N.M. at 791.

In his deposition testimony, explaining why he did not accompany Plaintiff to the hospital, Romero indicated that he believed that after Plaintiff refused three or four times to take the test, he had sufficient evidence to charge him with aggravated DWI.  *See* Romero depo. at 90:24-96:4.

Moreover, one of the additional elements that Plaintiff must prove in order to sustain a malicious prosecution claim is that Romero acted with malice in charging him.  Plaintiff has not come forward with any evidence to make this showing. In fact, Plaintiff's motion for partial summary judgment devotes only two lines of conclusory argument to this element.  He suggests that, because no genuine issue of fact exists regarding Romero's lack of probable cause to arrest him, no dispute exists that Romero acted with malice.  *See* Pl. MSJ [Doc.60] at 18.  Plaintiff then concludes that "[w]hile Defendant may suggest some alternative motive, clearly his actions have demonstrated that he had an improper purpose."  *id.*  This is not evidence; it is simply argument, and it is insufficient to establish one of the elements of Plaintiff's claim.  If a lack of probable cause to arrest was enough, by itself, to establish malice, malice would not need to be established

as a separate element of the claim.   Plaintiff's malicious prosecution claim therefore fails for this reason as well.

     4.      <u>Excessive Force</u>

An excessive force claim is analyzed under the Fourth Amendment as an unreasonable seizure because "courts have long recognized that the reasonableness of a seizure depends not just on why or when it was made, but also how it is accomplished." *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009).  As such, "[t]he touchstone of the reasonableness inquiry in an excessive force claim...is whether the officers' actions are *objectively unreasonable*," so that the focus must be on neither the officer's motivations nor on the arrestee's subjective perceptions, "but on 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (emphasis in original).

In order for an excessive force claim to succeed against a defendant's claim of qualified immunity, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007).  The Fourth Amendment "does not require [police] to use the least intrusive means in the course of a detention, only reasonable ones." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005).  Significantly, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396.  Instead, the reasonableness of the officer's belief as to the appropriate level of force must be judged from the on-scene perspective . *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  The Court assesses objective reasonableness based on "whether the

totality of the circumstances justified the use of force" and it "pays careful attention to the facts and circumstances of the particular case." *Estate of Larsen v. Murr, et al.*, 511 F.3d 1255, 1260 (10th Cir. 2008) (citation omitted).

Plaintiff alleges three categories of injuries that were allegedly caused by Romero's excessive force: (1) Plaintiff's back injury, which allegedly lead to the leg numbness for which he was hospitalized; (2) the injury to his left knee; and (3) miscellaneous other injuries. The Court will address each of these in turn.

### A.   Back Injury

Plaintiff claims that he suffered an aggravation and exacerbation of his pre-existing back injury when Romero pushed him into the back of the police car after arresting him, kept him sitting in a chair with his hands cuffed behind his back, and jumped on his back after he fell off of the chair by the breathalyzer machine. Plaintiff alleges that, when he was asked to take the field sobriety tests, he notified Romero that he may not do well because he had previously had his ACL replaced and he had three herniated disks. *See* Zubia Depo. at 129:23-130:4. Thus, he contends, Romero was aware that he had a back injury. Plaintiff claims that his back was first injured when Romero "shoved" him into the police car. *See* Doc. 75 at 3, ¶ 23. This is not the type of case in which Plaintiff was already suffering from a grave injury in need of immediate medical attention when first confronted by Romero, such that the actions of Romero were likely to seriously aggravate his injury. *Cf. Fisher*, 584 F.3d at 896. Instead, Plaintiff simply made a vague complaint about a back injury, in an apparent attempt to justify a potential failure of his field sobriety test. Indeed, Plaintiff admits that he did not complain of any pain prior to his arrest. *See* Zubia Depo. at 134:18-20. Plaintiff's own expert apparently does not consider the "shove" into the back of the police car as a cause of his back injury. *See* Deposition of Dr. Keith Harvie*,*

attached as Ex. M to Doc. 64, at 27:11-28:19.  Under these circumstances, the Court cannot find that a "shove" into the back of a police car, which had the alleged effect of causing a back spasm, rises to the level of a constitutional violation.  *See Fischer*, 584 F.3d at 896 (citing *Rodriguez v. Farrell,* 280 F.3d 1341, 1352-53 (11th Cir. 2002)) (concluding officer did not use excessive force when he handcuffed plaintiff's arms behind his back, despite the fact that handcuffing led to eventual amputation of his arm, because officer did not know of plaintiff's preexisting injury).

Both Plaintiff's expert and Defendants' expert agree that it is likely that any pain and numbness experienced by Plaintiff was caused by an arching of his lower back as a result of being handcuffed while sitting in a chair.  *See* Deposition of Dr. Keith Harvie*,* attached as Ex. M to Doc. 64, at 27:11-28:19; Report of Dr. Robert Afra, attached as Ex. S to Doc. 64, at 28.  Plaintiff contends that, prior to falling to the floor, he asked Romero if he could stand up, because he was having back spasms, but that Romero did not respond.  *See* Zubia Depo. at 154:22-156:4. Plaintiff does not allege that, prior to falling out of the chair, he ever told Romero that the handcuffs were hurting him.  Based on the evidence presented, the Court cannot find that sitting Plaintiff in a chair in handcuffs, which experts conclude aggravated or exacerbated his spinal stenosis, was an objectively unreasonable use of force, especially in light of the fact that Plaintiff did not object to the handcuffs.  Romero testified that he normally gives breath tests with subjects' hands cuffed behind their backs, and Plaintiff did not contest this.  *See* Romero Depo. at 72:20-73:3.  Thus, it appears that Plaintiff was not treated differently or more harshly than other subjects in this respect.

Finally, Plaintiff contends that, when he fell off of the chair, Romero "jumped onto his back."  Romero contends that, because he was alone in the room with Plaintiff at the time he left the chair, and he was unsure of Plaintiff's intentions, he secured Plaintiff in a standard face-down

stabilization position with his knee across Plaintiff's back.  *See* Statement of Material Fact 28, Doc. 64 at 6.  Although Plaintiff denied that Romero placed him in a standard face-down stabilization position, he offered nothing to support this denial.  Defendant's expert on defensive tactics and use of force wrote in his report that "[i]f Deputy Romero felt that the plaintiff was trying to flee the room and fell in the process, he would have been justified in using a knee, over Mr. Zubia['s] shoulder to stabilize his body, so he could not get up."  *See* Report of Bruce M. Hancock, attached as Ex. H to Doc. 64, at 4.  Plaintiff admits that he believes that Romero thought he was trying to run away.  *See* Zubia Depo. at 158:23.  The totality of the circumstances appears to justify Romero's attempt to stabilize Plaintiff, and the Court cannot say that it was objectively unreasonable, even if it had the ultimate effect of exacerbating Plaintiff's pre-existing spinal stenosis.  This is especially true in light of the fact that Romero summoned medical personnel shortly thereafter and that he moved Plaintiff's handcuffs to the front in an attempt to relieve some of the pressure from his back.

      B.    <u>Knee Injury</u>

     Plaintiff also claims that he suffered a tear to the meniscus of his left knee as the result of treatment at the hands of Romero.  Specifically, Plaintiff claims that "Romero enlisted the help of other deputies and tried to lift [Plaintiff] up by his arms, while pinning his legs down to make him stand, causing injuries to [Plaintiff's] knee."  Complaint at 8, ¶ 64.  Plaintiff has presented reports from two experts who have concluded that the type of injury he suffered is consistent with the treatment he allegedly received.  *See* Report of Dr. Samuel Tabet, attached as Ex. E to Doc. 61, at 1; Report of Dr. Keith Harvie, attached as Ex. O to Doc. 75, at 14.  Defendants rested their argument regarding the propriety of Plaintiff's claim for his knee injury solely on the *Daubert* motion that they filed with respect to the testimony of Drs. Tabet and Harvie.  *See* Deft. MSJ

[Doc. 64] at 20-21.  The Court held a *Daubert* hearing on March 1, 2011, following which it ruled that Drs. Tabet and Harvie could testify that Plaintiff's injury appeared consistent with trauma of the type he described.  *See* Doc. 98 at 3.  Both doctors indicated that their conclusions regarding causation were heavily dependent on the accuracy of the information they received, including the history of the incident from Plaintiff.  Thus, a determination of whether Plaintiff's injury was caused by the actions of Romero is dependent, in part, on an assessment of Plaintiff's credibility. This is a task for the jury.  Because Plaintiff has come forward with sufficient evidence to create a triable question of fact about the origin of his knee injury, Defendants' motion for summary judgment will be denied with respect to this aspect of his excessive force claim.

> C.   Miscellaneous Injuries

Plaintiff has alleged several other injuries that he claims to have suffered at the hands of Romero and other deputies, for instance that he had abrasions on his stomach, that his shirt and pants were torn from being dragged along pavement by Romero, and that he had ankle and wrist pain requiring x-rays.  However, an excessive force claim requires proof of some actual injury that is not *de minimis*, *see Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007), and Plaintiff has not come forward with any such proof with regard to these miscellaneous injuries.

The Bernalillo County Fire Department emergency medical personnel observed no trauma to Plaintiff and did not note any torn clothing, abrasions, bruising, or other signs of trauma.  *See* Sherman Depo. at 44:18-45:19.  Nor did responders from Albuquerque Ambulance note any torn clothing, scrapes, abrasions, or other physical signs that Plaintiff had been mistreated, despite performing a head-to-toe assessment.  *See* Aragon Depo. at 25:5-27:12.  Similarly, no indications of abrasions, scrapes, or other signs of a beating are present in emergency room or hospital nursing notes.  Plaintiff's treating physician in the hospital, Dr. Gelinas, denied recalling any

signs that Plaintiff had been in an altercation or that he had any abrasions or lacerations, and indicated that he would have noted such injuries in his records if he had observed them. *See* Deposition of Dr. Claude Gelinas, attached as Ex. P to Doc. 64 at 16:10-17:3. Dr. Gelinas also stated that his physician assistant, Jacques Pasternacki, did not express concerns about having observed any injuries, abrasions, or bruising. *Id*. Mr. Pasternacki confirmed that the only evidence of injury that he noticed when Plaintiff was evaluated at the hospital was mild redness on the wrists and a small excoriation in the right forearm. *See* Deposition of Jacques Pasternacki, attached as Ex. R to Doc. 64, at 26:17-27:8. Plaintiff's expert, Dr. Harvie, who reviewed and summarized all of Plaintiff's hospital records also noted no evidence of injury outside of the reported back spasms and numbness. *See* Report of Dr. Harvie, attached as Ex. O to Doc. 75, at 7-8.

Thus, Plaintiff has failed to come forward with evidence of injuries other than the back and left knee injuries already discussed above. He cannot recover for simple redness to his wrists. *See Cortez*, 478 F.3d at 1129 (evidence that handcuffs left red marks that were visible for days is insufficient as a matter of law to support an excessive force claim if the use of handcuffs is otherwise justified). While Plaintiff contends that his right knee was in pain at the hospital, causing x-rays to be taken, he has specifically stated that he is not claiming any injury to his right knee. *See* Zubia Depo., attached as Ex. I to Doc. 61, at 226:6-22.[6] Similarly, although Plaintiff now claims that his left ankle experienced pain, causing him to have to undergo x-rays, this does not appear to be discussed in his hospital records, there no indication that an x-ray, if it was taken,

---

[6] Although, in his deposition, Plaintiff initially contended that he had surgery on his right knee as a result of this incident, and that he was claiming no injury to his left knee, he later filed a correction to his deposition, clarifying that all references to his right knee should be read to be left knee, and *vice versa*.

pointed to an injury, nor does Plaintiff present any medical testimony on this subject. Thus, the Court concludes that he has not come forward with sufficient evidence of other injuries caused by excessive force to survive summary judgment.

5.    State Law Claims

The New Mexico Tort Claims Act waives immunity from suit for law enforcement officers acting within the scope of their duties who commit certain intentional torts such as assault, battery, false imprisonment, false arrest, or malicious prosecution. NMSA 1978 § 41-4-12. Plaintiff has raised state law claims for false imprisonment, false arrest, malicious abuse of process, and assault and battery.

A.    False Imprisonment and False Arrest

A claim for false imprisonment is stated "when a person intentionally confines or restrains another person without consent and with the knowledge that he has no lawful authority to do so." *Santillo v. N.M. Dep't of Pub. Safety*, 143 N.M. 84, 88 (Ct. App. 2007). A false arrest is one way of committing false imprisonment. *Id.* If an officer has probable cause to arrest a person, he cannot be held liable for false arrest or imprisonment, because "probable cause provides him with the necessary authority to carry out the arrest." *Id.* Because the Court has already found that Romero had probable cause to arrest Plaintiff for DWI, he cannot be liable for false imprisonment or false arrest.

B.    Malicious Abuse of Process

Malicious abuse of process occurs when: (1) a person initiates judicial proceedings against another; (2) the defendant commits an act in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive of the defendant in misusing the process is to accomplish an illegitimate end; and (4) the plaintiff suffers damages. *See*

*Fleetwood Retail Corp. v. LeDoux*, 142 N.M. 150, 154 (2007).  The second element, misuse of

process, can be shown by demonstrating either: (1) a complaint filed without probable cause; or

(2) an "irregularity or impropriety suggesting extortion, delay, or harassment."  *Id.* (quoting

*Devaney v. Thriftway Mktg. Corp.*, 124 N.M. 512, 522 (1997)).  As previously discussed,

Defendants have demonstrated that Romero had probable cause to charge Plaintiff with both

simple and aggravated DWI.  While probable cause is not enough to defeat a claim of malicious

abuse of process in the face of a showing of a significant procedural irregularity, Plaintiff has not

attempted to make any such showing in this case, nor does the record reflect any procedural

irregularities.  Therefore, Defendants are entitled to summary judgment on this claim.

> C.    Assault and Battery

Battery is the "unlawful, intentional touching or application of force to the person of

another, when done in a rude, insolent or angry manner." NMSA 1978 § 30-3-4.  Under New

Mexico law, police officers are accorded great latitude in the use of force and afforded the utmost

protection by courts when acting in good faith and using no more force than reasonably necessary

to accomplish the performance of their duties because "emergencies [may] arise when the officer

cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise

afterwards upon investigations in court."  *State v. Gonzales*, 97 N.M. 607, 610 (Ct. App. 1982)

(quoting *Mead v. O'Connor*, 66 N.M. 170, 173 (1959)).  The Court has already concluded that it

is a question of fact for the jury whether standing on the backs of Plaintiff's legs and attempting

to pull him up, as Plaintiff alleges Romero and other deputies did, constitutes unnecessary force.

This claim will be allowed to stand.  All other acts of Romero are considered justified under the

law for the same reasons explained above, and Plaintiff's other claims of battery are therefore

dismissed.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion for Partial Summary Judgment on Plaintiff's Malicious Prosecution Claim* [Doc. 60] is DENIED and Defendants' *Motion for Summary Judgment* [Doc. 63] is GRANTED in part and DENIED in part.

**UNITED STATES DISTRICT JUDGE**

33